AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Use of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>THE CELLULAR TELEPHONE ASSIGNED CALL<br>NUMBER 937-219-0721 | )<br>)<br>)<br>)<br>)<br>)    Case No.    3:21MJ197 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

     See Attachment A-1

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

     See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

     ☑ evidence of a crime;

     ☑ contraband, fruits of crime, or other items illegally possessed;

     ☑ property designed for use, intended for use, or used in committing a crime;

     ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute/distribution of controlled substances |
| 21 USC s. 843(b) | use of telephone communication facility |
| 21 USC s. 846 | conspiracy to possess with intent to distribute/distribute controlled substances |

The application is based on these facts:
     See Attached affidavit of Austin Roseberry

     ☑ Continued on the attached sheet.
     ☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order. Consistent with the requirement for an application for a pen register order, I, Brent Tabacchi, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the DEA. See 18 U.S.C. §§ 3122(b), 3123(b).

*Austin Roseberry*
*Applicant's signature*

Austin Roseberry, SA of the DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by reliable electronic means

Via
FaceTime

Date:    5/24/21

*Sharon L. Ovington*

City and state:    Dayton, Ohio        Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Austin M. Roseberry, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application for a search warrants under

Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the

location of the cellular telephones assigned call numbers:

      **a.**    937-219-0721 ("Target Telephone 1" or "TT1"),  a cellular device

          serviced by T-Mobile with IMSI 310260508494782 and subscribed to in

          the name of Carlene Yvonne, 1743 Academy Pl., Dayton, Ohio, which is

          more fully described in Attachment A1.

      **b.**    937-396-4935 ("Target Telephone 2" or "TT2"), a cellular device

          serviced by T-Mobile with IMSI 310260243825028 and subscribed to in

          the name of Jennifer M. Ferman, 15 York Avenue, Dayton, Ohio, which is

          described more fully in Attachment A2.

      **c.**    937-895-5179 ("Target Telephone 3" or "TT3"),  a cellular device

          serviced by T-Mobile with IMSI 310260358161933 and subscribed to in

          the name of Mario Turner, 604 Roy Avenue, Dayton, Ohio, which is

          described more fully in Attachment A3.

      **d.**    937-661-3985 ("Target Telephone 4" or "TT4"), a cellular device serviced

          by T-Mobile with IMSI 312530215443662 and subscribed to in the name

of Leroy Brown, 1842 Kipling Dr., Dayton, Ohio, which is described more

fully in Attachment A4.

(collectively, the "**Target Telephones**"). The location information to be seized from the **Target Telephones** is described herein and in Attachments B-1 through B-4.

2.     Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.     I am a Special Agent of the Drug Enforcement Administration (DEA), assigned to the Dayton Resident Office. As such, I am an "investigative or a law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 801, et. sec., and Title 18, United States Code, Section 2516.

4.     I have participated in numerous narcotics investigations during the course of which I have conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed recorded conversations and records of drug traffickers. Through my training, education, and experience (including debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, and conducting surveillance on numerous

occasions of individuals engaged in drug trafficking), I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, the various ways drug money is laundered, and the efforts of persons involved in such activities to avoid detection by law enforcement.

5.     I have participated in the investigation and prosecution of complex narcotics enterprises, including major narcotics organizations.  These investigations included the use of court-ordered eavesdropping. I have also conducted extensive analyses of telephone billing records for telephones used by narcotics traffickers.  Members of the Dayton Resident Office also have extensive experience in narcotics investigations, especially involving high-level narcotics traffickers and money launderers.  I have had and continue to have conversations with them concerning this and other narcotics related investigations. I have worked on surveillance and enforcement teams working in conjunction with court authorized T-III intercepts. I have worked as a monitor, listening to T-III intercepts, determining minimization of intercepts, and directing surveillance and enforcement teams to take action based on T-III intercepts that I monitored.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances/distribution of controlled substances), 843(b) (use of a communication facility to

facilitate a felony drug offense) and 846 (conspiracy to possess with intent to distribute and to distribute controlled substances) have been committed, are being committed, and will be committed by Clemente Quezada and the users of the **Target Telephones.** There is also probable cause to believe that the location information described in Attachments B-1 through B-4 will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

8.      The DEA is currently investigating a Dayton, Ohio based fentanyl and methamphetamine drug trafficking organization (DTO). During this investigation, DEA has identified Clemente Quezada as an individual who coordinates the shipment and distribution of kilogram quantities of illegal drugs within the Dayton, Ohio region.

9.      During late March 2021 and again during early May 2021, DEA sought and received orders from the Honorable Thomas M. Rose, District Court Judge of the United States District Court for the Southern District of Ohio, authorizing interception of wire communications over telephone number 937-219-9324, a cellular telephone used by Clemente Quezada. Prior to the court-authorized interceptions, DEA employed surveillance and consensually monitored calls to learn that Quezada used this number to coordinate the delivery of fentanyl to a purported customer during February 2021. DEA has executed Judge Rose's orders, and during March, April and May 2021, it has intercepted wire communications between Quezada at 937-219-9324 and various individuals involving drug transactions as detailed below.

A. **Quezada and Target Telephone 1 Arrange a Drug Transaction During May 2021**

10.     During May 2021, Quezada engaged in a series of calls with the user of Target

Telephone 1 (namely – 937-219-0721) concerning the delivery of a sample of an unknown type

of illegal controlled substance.  Specifically, on May 11, 2021, Quezada called Target Telephone

1 and engaged in the following lawfully-intercepted conversation with its user (identified as

TT1):

TT1:          Hello?

QUEZADA:   Hello?[Voices overlap]

TT1:          Hello?

QUEZADA:   What up? Who this? I know I aint' supposed to be answerin' 'cause I call you, but
              my people told me to call you.

TT1:          Who told you to call me?

QUEZADA:   Uh, Mexican dude.

TT1:          Oh, what's goin' on?

QUEZADA:   What's goin' on witchu', man?

TT1:          Man, oh, you supposed to give his demo.

QUEZADA:   Yeah, yeah, I know, I know, I know, I know, I know. Whatchu' got goin' on for
              today? [Sighs] I was out of town and shit, I just got back, that's what it was.

TT1:          Oh, you good uh [Pause] no ain't gettin' [Phonetic] too much now. I mean, I got
              [Pause] I'mma be busy 'round like five thirty.

QUEZADA:   If you wanna link up in the morning, we could do that. That looks good. Where
              you stay at?

TT1:          I'm in Dayton.

QUEZADA:   Me too. I'm in Beavercreek.

TT1:        Oh, I'm uh, I'm on the west side.

QUEZADA:    Oh, okay, okay, okay, okay, okay. So, what you wanna, however, you wanna
            meet out half way or you just want me to come. If you want me to come to you,
            gone have to be in the mornin'.

TT1:        Yeah, we can just wait till the morning then. I need you to come to me.

QUEZADA:    A'ight.

TT1:        A'ight. [Voices overlap]

QUEZADA:    So, I'll call you like around [Pause], I'll be up early in the morning, so I'll call
            you, so you can send me, shoot me the address, and I come through.

TT1:        Okay.

QUEZADA:    A'ight.

TT1:        Mm.

Based on my training and experience and my familiarity with this case, I believe that Quezada

advised that his source of supply (Mexico) had directed him to call TT1. TT1 responded that

Quezada was to provide a sample of drugs (demo) to TT1. Quezada and TT1 ultimately agreed

to meet the following day to make this exchange.

        11.    On May 12, 2021, Quezada called Target Telephone 1 and engaged in the

following lawfully-intercepted conversation with its user (identified as TT1):

TT1:        Hello?

QUEZADA: What up, bro?

TT1:        What up, with it?

QUEZADA: Shit. You can shoot me the address, I can come drop you, that, that, that picture.

TT1:        Oh. [Sniffs] Oh, shit, I'm really 'bout to be in traffic. I'm 'bout to go drop my son
            off for school and make some runs. Uh, shit, shit, shit, shit. [Sniffs]

QUEZADA: Well, shit, hit me up when you're ready then.

TT1:        What, what, I mean, I'm, I'm ready.  But, I can meet you in traffic.  What uh, [Sniffs] what area you, you familiar with?

QUEZADA: Not really much.  I be out in Day-, Beavercreek. [Pause] But, you send me an address uh-. [Voices overlap]

TT1:        Are you-.  Okay, listen. [Voices overlap]

QUEZADA: What, what's up?

TT1:        You, you, you 'bout to be coming this way right now?

QUEZADA: Yeah.  You send me the address, I'll be on my way.

TT1:        A'ight.  Imma, Imma send you, oh, okay, I'm 'bout to send you a address.

QUEZADA: A'ight.

TT1:        A'ight.

QUEZADA: A'ight.

Based on my training and experience and my familiarity with this case, I believe that Quezada

contacted TT1 to arrange a location to meet and to deliver the sample of controlled substances.

Moments after the above-described call, TT1 contacted Quezada and engaged in the following

lawfully-intercepted call with him:

QUEZADA:  Hello?

TT1:        Bro, I can't fi-, I can't figure out no address.  Just uh, put in, in Westown Shopping Center.  I know that's, that's close to Ram [Phonetic].  I can just meet you there.

QUEZADA:  Westown? [Voices overlap]

TT1:        Oh, oh, oh, O'Reilly's on, in Westown, on Third.

QUEZADA:  Shit, you, we can just meet up on Main Street right there.

TT1:        Main Street, where?

QUEZADA:    By, by, by the Marathon it's on, it's a, it's a, it's a DJ Auto Shop right there. I don't know.

TT1:        D-. That's cool, that's cool, that's cool, I can, we could go over [Unintelligible], man.

QUEZADA:    Alright.

TT1:        A'ight. [Voices overlap]

QUEZADA:    I'm 'bout to be on my way now.

TT1:        How long?

QUEZADA:    Shit, I'll be on my way now. You [Unintelligible] take like ten, fifteen minutes to get there.

TT1:        A'ight.

QUEZADA:    A'ight.

Based on my training and experience, and familiarity with the facts of this case, I believe that

Quezada and TT1 agreed to meet at a gas station near DJ Auto Shop in the Dayton-metro area to

complete the planned transaction.

      12.     Around the time of these calls on May 12, 2021, DEA maintained surveillance on

Quezada and watched as he left his home in Fairborn, Ohio and drove to a Marathon gas station

in Dayton, Ohio. Upon arriving at the gas station, a man believed to be Daryll Lee, exited a tan

Tahoe and entered Quezada's car. They remained in the car for a short time. Lee then exited

Quezada's car, returned to the Tahoe, and left the area. Coupling this surveillance with the

lawfully intercepted calls described above, I believe that Quezada delivered a sample of illegal

controlled substances to Lee, the likely user/holder of Target Telephone 1.

**B. Quezada and Target Telephone 2 Arrange a Drug Transaction During April 2021**

13.    On or about April 9, 2021, Quezada received an incoming call from Target Telephone 2 (namely, 937-396-4935) and engaged in the following lawfully-intercepted conversation with its user (identified as TT2):

QUEZADA:   [UNINTELLIGIBLE]

TT2:          Yeah, you hear me?

QUEZADA:   Yeah.

TT2:          Yeah, you said what's up?

QUEZADA:   What time you get off work?

TT2:          Uh, probably like around three or four.

QUEZADA:   Hey, hey, you have two onions in your house?

TT2:          Uh two onions? Uh, yeah.

QUEZADA:   Okay, um... when he gonna come by here and get it. He don't [UNINTELLIGIBLE] he wants that.

TT2:          Who?

QUEZADA:   Uh, Westby [PHONETIC].

TT2:          Yeah.

QUEZADA:   Uh, uh, uh, also uh, [ASIDE: fuck it] Um, give him a hundred of vitamins.

TT2:          But I can't go the way over there, bro.

QUEZADA:   No, he's comin' down here, bro.

TT2:          Oh, okay, okay.

QUEZADA:   Yeah, so he want me to wait, I'll call you right on.

TT2:          Oh, alright.

QUEZADA:    I was just lettin' you know.

TT2:        Okay, that's cool.

QUEZADA:    Alright.

TT2:        Alright, bro.

QUEZADA:    Alright.

Based on my training and experience, and familiarity with the facts of this case, I believe that

Quezada inquired if the user of Target Telephone 2 was holding at least two ounces of an

unknown controlled substance.  When the user of Target Telephone 2 indicated that he was,

Quezada directed him to deliver it to an unknown person.  Additionally,  Quezada explained that

the buyer planned to meet the user of Target Telephone 2.  Based on the foregoing, I believe that

the user of Target Telephone 2 holds and distributes drugs for Quezada.  Moreover, the user of

Target Telephone 2 was a man, yet this phone is subscribed to in the name of Jennifer M.

Ferman.  I know that drug dealers such as the user of Target Telephone 2 frequently place their

phones in the name of nominee holders.  Based on a review of toll records, Target Telephone 2

remains active as of May 2021.

### C.  Quezada and Target Telephone 3 Arrange a Payment for Drugs During May 2021

14.     On or about May 18, 2021, Quezada received an incoming call from Target

Telephone 3 (namely, 937-895-5179) and engaged in the following lawfully-intercepted

conversation with its user (identified as TT3):

QUEZADA:    Hello?  What's up?

TT3:        Hello?  Wassup, fat man?

QUEZADA:    Shit, at the house, I'm 'bout to lay down.  [Voices overlap]

TT3:        Yo, whatchu doing?

QUEZADA:     Yeah.

TT3:          You 'bout to lay down?

QUEZADA:     Huh?

TT3:          What's wrong with you? You feeling good? What's wrong with you? You ain't feeling good? [Voices overlap]

QUEZADA:     Got too much shit going on. [Laughs] Why, wassup?

TT3:          You said you got too much shit going on. Like what? What's wrong? [Voices overlap]

QUEZADA:     I'm running room for right now, man. Yeah, I'm positive.

TT3:          You sho'?

QUEZADA:     Oh, you're sure though? What you got going on?

TT3:          Okay. I heard. Uh, nothin' at the [Unintelligible] shit. Nah, uh, but uh, I appreciate uh, I appreciate, you know what I'm saying, you helpin' me out and being patient with me and shit. I mean, I know you told me to just throw a little shit to my sister, but you know, I would've been through it, [Unintelligible] you tell me. But, I just, you know, I appreciate it, the lil help, it's like, you know, I was going… [Voices overlap]

QUEZADA:     Hold on.

TT3:          …through some things and shit. You was like, "Shit, don't worry about it, until you can get your stuff together."

QUEZADA:     Yup.

TT3:          I just appreciate it, cuz. Shit. I know I've been like, I've been running into a check, though. [Voices overlap]

QUEZADA:     Fuck you motherfucker, give her, her money! [Laughs]

TT3:          I, you know, here and there, you know, but I got like-. You know I got like, 5 kids and shit, man. [Voices overlap]

QUEZADA:     I got 4, nigga.

TT3:        I be juggling trying to do every goddamn thing.  I, I was gone bring it, I was
            gone bring it to you.  But motherfuckers be busy though.  [Voices overlap]

QUEZADA:    We at the house, come through, nigga. [Laughs]

TT3:        But, Imma bring it.  Imma.  Yeah, Imma bring it.  Imma bring it.  Imma bring it.
            I just appreciate it, [Stammers] I appreciate it.  I, I just appreciate you didn't step
            on my neck about it, you feel me?  [Voices overlap]

QUEZADA:    Oh, no, no.  That's what we're here for.  Help each other out when we need it.
            [Aside: Look, could you close your mama's door?  I'll bring the medicine then.]
            [Voices overlap]

TT3:        Uh-huh.  Uh, man, bet.  I mean, I'm tired as hell.  I need to go for, down that
            way, shit.  But I gotta go, I gotta, uh my fucking [Mumbles].  I had put Ebony's
            car in the shop, and I just sold the others cars and shit.  'Cause we only got one
            car.  So, I gotta go meet her on her break and shit, make sure her lil' weird ass
            eat.

QUEZADA:    Yeah, where you gone be?  Where you gone be at?  Just let me know if you'll
            come through.

TT3:        Yeah, yeah, yeah, I'm, I'm definitely about to try to, uh, uh, pulling up that way
            though.  Mother fucking-.  I know I'm coming through tomorrow though.  Uh-.
            [Voices overlap]

QUEZADA:    Alright.  Cool.

TT3:        [Unintelligible] shit.

QUEZADA:    Listen, [Unintelligible] tomorrow, nigga.

TT3:        A'ight, shit.  Maybe we, be around and collab….

QUEZADA:    Yup.

TT3:        …and do somethin' tomorrow, or somethin'.  Know what I'm saying?  Take you
            out to eat or somethin'. [Mumbles] [Voices overlap]

QUEZADA:    I, I think my, I think my son be here tomorrow, too.  I gotta go pick him up at the
            airport tomorrow.

TT3:        Oh, fo' sho', we thought it was gone uh, from New York? [Voices overlap]

QUEZADA:     He's gone come live with us.  Yup.

TT3:          Oh, good [Unintelligible]. [Voices overlap]

QUEZADA:     That's why we need a bigger house.  Yup. [Voices overlap]

TT3:          Mm-huh.  Hell yeah.  Where ya'll gonna try to move to?  Ya'll staying Green County or ya'll coming to the city? [Voices overlap]

QUEZADA:     Nah, we ain't going to the city.  [Pause]

TT3:          Oh, why not?  [Voices overlap]

QUEZADA:     Your sister likes the burbs.

TT3:          I mean, shit, you can still live in the burbs in the city, yeah.

QUEZADA:     We gone see, we weren't looking right now.  Yeah, yeah, yeah, yeah.  We got, we got uh-. [Voices overlap]

TT3:          Like, gone be [Unintelligible] all that shit.

QUEZADA:     We just gone need some funds.  I bought this uh, uh-.

TT3:          It's all [Unintelligible] some out there in Centerville, man.  They be on bullshit.

QUEZADA:     Yeah, I [Unintelligible] right now, is uh, fourteen hundred for rent.

TT3:          Yeah.  [Voices overlap]

QUEZADA:     We tryin' to get a three or four bedroom, two, at least two-bathroom.  It's gone be four of us.

TT3:          Man, fuck, fuck paying rent, man.  You need to uh, call a, realtor, and seeing about uh, cashing out on a foreclosure, man.  [Voices overlap]

QUEZADA:     Yeah, we gone do that, but for, for right now.  I wanna-.

TT3:          They only, they only, they only want like, they only want like seven to eight percent.  Like, you could put up, you could put up like seven or eight grand. [Voices overlap]

QUEZADA:     Yeah, yeah, but, but, but we, look, but listen to-.  Goddamn it, listen to me.  I'm tryin'-.  When I have the money to do that, then Imma do it.  I'm trying to save

up the money for that. But right now, I got other things I gotta take care real quick. So, I can't do that right now. I sign [Phonetic] quick.

TT3: Yeah. A'int nothin' wrong with it. I already know. I know how it is, nigga, be juggling. [Voices overlap]

QUEZADA: I sign [Phonetic] quick.

TT3: [Stammers] I just know, I, shit, I can't, I got another mother fucker fourteen hundred, man. That's [Unintelligible].

QUEZADA: No, I want, 'cause, we, we really wanna buy a house. That's why I'm, that's why-. [Voices overlap]

TT3: Yeah, I, I feel like fourteen hundred is a house payment, you know? [Voices overlap]

QUEZADA: Yeah, I know. Well, that's why I, that's why, that's why I'm buying me no, no, no, fancy car yet, because I wanna get a house first. Yeah.

TT3: Yeah. There's nothin' wrong with that. [Voices overlap]

QUEZADA: Yeah. Shit, we'll talk about that tomorrow when you get here.

TT3: A'ight.

QUEZADA: A'ight, cool.

TT3: You got it, you got it. I'll see you tomorrow fool.

QUEZADA: A'ight, bye.

TT3: Yup.

Based on my training and experience, as well as my familiarity with the facts of this case, I know that, during this conversation, the user of Target Telephone 3 thanked Quezada for giving him additional time to pay money to Quezada. Given the context of this call (and other calls made by Quezada), I know that Quezada had been trying to collect drug proceeds from his customers as payment to his (Quezada's) source of supply. Additionally, it appears that the user of Target

Telephone 3, in fact, is Mario Turner, as listed in the subscriber information. Quezada is married to Sharmaine Turner. During the call, Quezada made reference to the "sister" of the user of Target Telephone 3.

### D. Quezada and Target Telephone 4 Arrange a Drug Transaction During April 2021

15. On or about April 7, 2021, Quezada placed an outgoing call to Target Telephone 4 (namely, 937-661-3985) and engaged in the following lawfully-intercepted conversation with its user believed to be Leroy Brown based on subscriber information for that number (identified as TT4):

TT4:        Yo!

QUEZADA: Hey, what up?

TT4:        What's the word?

QUEZADA: Shit.  [Aside: [Unintelligible].]

[Voices overlap]

TT4:        What's it looking like over there?

QUEZADA: Shit, um, [Pause] got fetty waps.

TT4:        Shit.  And I just haven't been able to, I ain't do shit with that shit in so long.

QUEZADA: Yeah.

[Voices overlap]

TT4:        What is it supposed to do?

QUEZADA: Uh, you can put 2 on it.

TT4:        Yeah, but I ain't be able to, [Stammers] let me, I might be able to dabble with some shit.  'Cause I aint, like I said, I ain't, I ain't touched that shit in so long, man.

QUEZADA: Yeah.

[Voices overlap]

TT4:      Yup, um, any of the other been around?

QUEZADA: Nope.

TT4:      Alright, um, Imma see if I can reach out to a couple of people, I ca-, I hit you back.

QUEZADA: Alright.

TT4:      Okay.

QUEZADA: Okay.

Based on my training and experience, and familiarity with the facts of this case, I believe that Quezada inquired if the user of Target Telephone 4 was interested in acquiring fentanyl for sale. The user of Target Telephone 4 inquired if the fentanyl could be cut (i.e., adding additional items to it to increase the quantity but not substantially dilute its strength), and Quezada indicated that, in fact, it could be. The user of Target Telephone 4 suggested that he had not sold fentanyl for a while but would ask around if other people might be interested. Based on the context of this call, I believe that the user of Target Telephone 4 is a customer of Quezada who has purchased drugs from him in the past. Based on a review of toll records, Target Telephone 4 remains active as of May 2021.

      16.      Based on the aforementioned information, I believe the **Target Telephones** are being utilized to facilitate the Quezada Drug Trafficking Organization in violation of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances/distribution of controlled substances), 843(b) (use of a communication facility to facilitate a felony drug offense) and 846 (conspiracy to possess with intent to distribute and to distribute controlled substances). The location of the **Target Telephones** would aid in the identification of the users holding and/or utilizing these devices and as well as locate the residences of known members of this

organization. Based on my training and experience, I know that individuals involved in the drug trade frequently utilize fictitious subscriber information in an effort to thwart law enforcement detection. Based on my training and experience, I know that T-Mobile can collect cell-site data about the **Target Telephones**. T-Mobile can also collect E-911 Phase II data about the location of the **Target Telephones**, including by initiating a signal to determine the location of the **Target Telephones** on its respective network or with such other reference points as may be reasonably available. I know that this location information will assist law enforcement to identify the user of the **Target Telephones**. Additionally, the location information may also lead law enforcement to locations at which the users of the **Target Telephones** are storing or selling illegal drugs. Additionally, this information will assist law enforcement to observe potential meetings between the users of the **Target Telephones** and other individuals with whom he/she is trafficking narcotics, *i.e.*, coconspirators.

## MANNER OF EXECUTION

17.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

18.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days after the collection authorized by the warrants has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of the **Target Telephones** would seriously jeopardize the ongoing investigation, as such a disclosure would give those persons an opportunity to destroy

evidence, change patterns of behavior, notify confederates, and flee from prosecution. Moreover, to the extent that the warrant authorizes the seizure of any tangible property, any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

19. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference T-Mobile's services, including by initiating a signal to determine the location of the **Target Telephones** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobiles for reasonable expenses incurred in furnishing such facilities or assistance.

20. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Telephones** outside of daytime hours.

21.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

*Austin Roseberry*

Austin M. Roseberry
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
On:  5/24/21

Sharon L. Ovington
United States Magistrate Judge

<u>**ATTACHMENT A-1**</u>

**Property to Be Searched**

1. 937-219-0721 ("Target Telephone 1" or "TT1"),  a cellular device serviced by T-Mobile with IMSI 310260508494782 and subscribed to in the name of Carlene Yvonne, 1743 Academy Pl., Dayton, Ohio.  T-Mobile is a company headquartered 4 Sylvan Way, Parisippany, New Jersey.

2. Information about the location of the Target Telephone 1 that is within the possession, custody, or control of T-Mobile.

<u>**ATTACHMENT A-2**</u>

1. 937-396-4935 ("Target Telephone 2" or "TT2"), a cellular device serviced by T-Mobile

   with IMSI 310260243825028 and subscribed to in the name of Jennifer M. Ferman, 15

   York Avenue, Dayton, Ohio  T-Mobile is a company headquartered 4 Sylvan Way,

   Parisippany, New Jersey.

2. Information about the location of the Target Telephone 2 that is within the possession,

   custody, or control of T-Mobile.

_____

<u>ATTACHMENT A-3</u>

1. 937-895-5179 ("Target Telephone 3" or "TT3"),  a cellular device serviced by T-Mobile
   with IMSI 310260358161933 and subscribed to in the name of Mario Turner, 604 Roy
   Avenue, Dayton, Ohio

2. Information about the location of the Target Telephone 3 that is within the possession,
   custody, or control of T-Mobile.

**ATTACHMENT A-4**

1.  937-661-3985 ("Target Telephone 4" or "TT4"), a cellular device serviced by T-Mobile
    with IMSI 312530215443662 and subscribed to in the name of Leroy Brown, 1842
    Kipling Dr., Dayton, Ohio.

2.  Information about the location of the Target Telephone 4 that is within the possession,
    custody, or control of T-Mobile.

**ATTACHMENT B-1**

**Particular Things to be Seized**

All information about the location of **Target Telephone 1** described in Attachment A-1 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone 1**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-1.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-MOBILE, T-MOBILE is required to disclose the Location Information to the government. In addition, T-MOBILE must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-MOBILE's services, including by initiating a signal to determine the location of the **Target Telephone 1** on T-MOBILE's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-MOBILE for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT B-2

### Particular Things to be Seized

All information about the location of **Target Telephone 2** described in Attachment A-2 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone 2**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-2.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-MOBILE, T-MOBILE is required to disclose the Location Information to the government. In addition, T-MOBILE must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-MOBILE's services, including by initiating a signal to determine the location of the **Target Telephone 2** on T-MOBILE's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-MOBILE for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

<u>ATTACHMENT B-3</u>

**Particular Things to be Seized**

All information about the location of **Target Telephone 3** described in Attachment A-3 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone 3**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-3.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-MOBILE, T-MOBILE is required to disclose the Location Information to the government. In addition, T-MOBILE must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-MOBILE's services, including by initiating a signal to determine the location of the **Target Telephone 3** on T-MOBILE's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-MOBILE for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT B-4

### Particular Things to be Seized

All information about the location of **Target Telephone 4** described in Attachment A-4 for a period of thirty days, during all times of day and night. "Information about the location of **Target Telephone 4**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-3.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-MOBILE, T-MOBILE is required to disclose the Location Information to the government. In addition, T-MOBILE must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-MOBILE's services, including by initiating a signal to determine the location of the **Target Telephone 4** on T-MOBILE's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-MOBILE for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).